# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CAUSE NO.: 2:18-CR-101-2-TLS-JEM |
| KATRINA OWENS | |

## OPINION AND ORDER

This matter is before the Court on Defendant Katrina Owens's objection to the Presentence Report ("PSR"), as submitted to the Court in the Addendum to the PSR [ECF No. 134]. For the reasons set forth below, the Defendant's objection is OVERRULED.

## FACTUAL AND PROCEDURAL BACKROUND

From approximately November 2017 through August 2018 a heroin drug trafficking operation ("DTO") was operating out of an apartment building at 4104 Madison Street in Gary, Indiana. PSR ¶¶ 8, 10, 23–25, ECF No. 133. The DTO was comprised of Defendant Katrina Owens and her four co-defendants: Lamont Coleman, Leroy Coleman, Tony Petty, and Augustine Pike. *Id.* ¶¶ 8–10. The PSR indicates that Co-Defendant Lamont Coleman owned the apartment building and was the leader of the DTO. *Id.* ¶¶ 8–9. The PSR also details that the Defendant maintained a leadership position in the DTO; however, the Defendant contends, in her Objection to the PSR, that she was merely a participant with no authority or control over the criminal enterprise. *Id.* ¶ 8. The remaining co-defendants were only minor participants, operating as "runners" at the direction of the DTO's leaders. *Id.* ¶ 9. Additionally, each of the co-defendants lived in the apartment building. *Id.* ¶¶ 9, 23.

The DTO's organization and business methodology was relatively simple. Co-Defendant Lamont Coleman and the Defendant would take calls from customers and dispatch a runner to

1

deliver heroin and collect payment. *Id.* ¶¶ 8–10. On twelve occasions, confidential informants went through this process to purchase heroin. *Id.* ¶¶ 11–22. The Defendant was involved in six such exchanges: Specifically, on January 25, 2018, January 29, 2018, March 13, 2018, April 19, 2018, May 10, 2018, and August 14, 2018, when the Defendant answered the confidential informant's phone calls, agreed to and arranged for the sale of heroin, and dispatched a runner to deliver, respectively, 0.941, 0.958, 0.984, 1.466, 0.608, and 2.090 grams of heroin in exchange for money. *Id.* ¶¶ 15, 16, 19–22. Co-Defendant Lamont Coleman answered the phone, organized the exchange, and dispatched runners for the remainder of the observed exchanges. *Id.* ¶¶ 11–14, 17-18. The last exchange involving a confidential informant took place on August 14, 2018. *Id.* ¶ 22.

On August 28, 2018, a Criminal Complaint [ECF No. 1] was filed and an arrest warrant was issued for the Defendant [ECF No. 3]. On August 28, 2018, law enforcement executed a search warrant at 4104 Madison Street, Apartment 1, Gary, Indiana. PSR ¶ 23. Co-Defendant Lamont Coleman and the Defendant were in the apartment at the time of the search. *Id.* Law enforcement recovered approximately 11.500 net grams of heroin, 3.451 net grams of cocaine base, and 12.500 gross grams of clonazepam pills. *Id.* Additionally, two firearms were recovered during the search. *Id.* On the day of the search each of the five defendants were arrested. *Id.* ¶¶ 23–25; Lamont Coleman Arrest Warrant, August 28, 2018, ECF No. 2. After their arrest, Co-Defendants Tony Petty, and Augustine Pike informed law enforcement of the organization's operations, namely that Co-Defendant Lamont Coleman and the Defendant would answer the phone when a customer called, negotiate the sale of heroin, and dispatch a runner to deliver the product. *Id.* ¶ 24. The Defendant later confirmed the confessions of her co-defendants. *Id.* ¶ 25.

The Defendant's Initial Appearance [ECF No. 6] occurred on August 28, 2018. On September 20, 2018, a Superseding Indictment [ECF No. 37] was filed with the Court. The Defendant was arraigned [ECF No. 52] on September 26, 2018. On July 10, 2019, the Defendant pled guilty [ECF No. 87] to Count 1 of the Superseding Indictment pursuant to the Plea Agreement [ECF No. 81], which was filed with the Court on June 18, 2019. Count 1 charged the Defendant with participating in a conspiracy to possess with intent to distribute a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 846. On August 14, 2019, the Court adjudged the Defendant guilty to Count 1 of the Superseding Indictment. [ECF No. 115].

On September 9, 2019, the Draft PSR [ECF No. 121] was filed. On September 23, 2019, the Government filed its objections to the Draft PSR [ECF No. 123]. The Defendant filed her objection to the Draft PSR [ECF No. 124] on September 30, 2019. The Final PSR and the Addendum to the PSR [ECF Nos. 133, 134] were then filed on November 4, 2019. The Addendum to the PSR indicates that the Government's objections have been resolved and that the Defendant objects to a two-level upward adjustment for playing an aggravating role in the offense. Addendum to the PSR 1, ECF No. 134. As the Defendant's objection concerns facts and issues that are relatively straightforward, no additional briefing was ordered.

**LEGAL STANDARD**

Section 2D1.1 of the Sentencing Guidelines sets forth the method by which sentencing courts are to determine the base offense level for a conviction under 21 U.S.C. § 846. U.S. Sentencing Guidelines Manual § 2D1.1 (U.S. Sentencing Comm'n 2018). After a sentencing court determines the base offense level and whether any specific offense characteristics are present, it must then consider whether any of the adjustments contained within Chapter 3 of the

Sentencing Guidelines are applicable. At issue in the instant case is whether an upward adjustment should be made to the Defendant's offense level for her role in the offense, pursuant to § 3B1.1 of the Sentencing Guideline.

Facts relevant to sentencing must be proved by a preponderance of the evidence, *United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009); however, "any fact that increases the penalty of a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," *United States v. Krieger*, 628 F.3d 857, 863 (7th Cir. 2010) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). "A district court may rely on facts asserted in the PSR if the PSR is based on sufficiently reliable information." *United States v. Rollins*, 544 F.3d 820, 838 (7th Cir. 2008) (citing *United States v. Schroeder*, 536 F.3d 746, 752 (7th Cir. 2008); *United States v. Artley*, 489 F.3d 813, 821 (7th Cir. 2007)).

## ANALYSIS

The PSR recommends that the Defendant receive a two-level upward adjustment for her aggravating role in the offense pursuant to § 3B1.1(c). Section 3B1.1(c) permits a sentencing court to increase a defendant's offense level by two levels for playing an aggravating role—such as an organizer, leader, manager, or supervisor—in a smaller criminal enterprise. Sentencing Guidelines Manual § 3B1.1 (c) (U.S. Sentencing Comm'n 2018). In contrast, Sections 3B1.1(a) and (b), which provide for a four- or three-level increase respectively, apply in circumstances where the criminal activity involves "five or more participants or is otherwise extensive." *Id.* § 3B1.1(a), (b).

### A. Section 3B1.1(c)

Notably, the PSR has recommended a two-level upward adjustment pursuant to § 3B1.1(c), PSR ¶ 47, notwithstanding the undisputed fact that five participants were involved in

the DTO, PSR ¶¶ 8–9, which would indicate that § 3B1.1(a) or (b) is applicable. The Government did not raise an objection seeking to the apply either § 3B1.1(a) or (b). Perhaps this is because the parties have observed that the DTO in this case is not as extensive as criminal organizations normally warranting the four- or three-point adjustment under § 3B1.1(a) and (b), despite the fact that the DTO otherwise meets the five-participant threshold of both § 3B1.1(a) and (b). The Court would agree with such an observation, as this neighborhood drug ring is hardly comparable to the criminal organizations that typically invoke the § 3B1.1(a) or (b) adjustments.

Despite the PSR's recommendation, it is the Court's position that it lacks the authority to split the difference; that is, it cannot apply § 3B1.1(c) when the conditions of § 3B1.1(a) or (b) have been met. The Seventh Circuit, at least through dicta, has instructed that a sentencing court cannot apply § 3B1.1(c) when the five-participant threshold of § 3B1.1(a) or (b) has been met. *See United States v. Mustread*, 42 F.3d 1097, 1103 (7th Cir. 1994). In *Mustread*, the court explained: "The trial judge found correctly that Mustread's criminal activity was large-scale because it involved more than five participants. The trial judge also found that the criminal activity was 'otherwise extensive.' Thus, Mustread could receive an increase under § 3B1.1(a) or (b), but not under § 3B1.1(c)." *Id.* The Seventh Circuit is not alone, as several other circuits have interpreted § 3B1.1 in the same manner. *See United States v. Scott*; 243 F.3d 1103, 1108 (8th Cir. 2001) ("[W]e have repeatedly held that the Guidelines do not authorize such a compromise adjustment—if the criminal activity involved five or more participants, as [the defendant] stipulated, § 3B1.1 permits either a four-level adjustment, a three-level adjustment, or no adjustment at all." (citing *United States v. Kirkeby*, 11 F.3d 777, 778–79 (8th Cir. 1993))); *United States v. Gonzalez-Vazquez*, 219 F.3d 37, 44 (1st Cir. 2000) ("[Section 3B1.1] sets forth a

precise adjustment scheme that cannot be modified by the district court. The Sentencing Commission did not provide for a partial upward adjustment under § 3B1.1, in contrast to other provisions where the Commission authorized the sentencing judge to select an intermediate adjustment." (citing as examples Sentencing Guidelines Manual § 2A2.2(b)(3)(D), (E), and § 3B1.2)); *United States v. Cotto*, 979 F.2d 921, 923 (2nd Cir. 1992).

Indeed, a plain reading of § 3B1.1(c) mandates this approach. Pursuant to § 3B1.1(c), a sentencing court may increase a defendant's offense level if the defendant plays an aggravating role in "any criminal activity other than described in [§ 3B1.1(a) or (b)]." Sentencing Guidelines Manual § 3B1.1(c) (U.S. Sentencing Comm'n 2018). As both § 3B1.1(a) or (b) describe criminal activity involving five or more participants, *id.* § 3B1.1(a), (b), the Court, regardless of any mitigating factor, is precluded from applying § 3B1.1(c) to a defendant who has engaged in criminal activity involving at least five participants. The criminal activity in the instant case involves at least five participants; therefore, the Court will only consider whether § 3B1.1(a) or (b) should be applied to the Defendant.[1]

### B. Section 3B1.1(a) and (b)

Section 3B1.1(a) and (b) can only be applied to a defendant if he or she acted as an "organizer or leader" or a "manager or supervisor," respectively. *Id.* § 3B1.1(a), (b). Section 3B1.1 does not define these positions; rather, it outlines the following seven factors for

---

[1] The Defendant counts as a participant for the purposes of § 3B1.1(a) and (b). *United States v. Williams*, 250 F. App'x. 725, 729–730 (7th Cir. 2007). Further, the five-participant threshold applies only to the number of participants comprising the criminal enterprise and not the number of participants subordinate to the defendant. *United States v. McGuire*, 957 F.2d 310, 316 (7th Cir. 1992) ("Nonetheless, the district court's increase in offense level was proper because § 3B1.1(b) does not require actual control over the 'five or more participants.' The plain language of § 3B1.1(b) requires only that a defendant was a manager '*and* the criminal activity involved five or more participants'—not that a defendant managed, or controlled, the five or more participants."); *see also United States v. Blaylock*, 413 F.3d 616, 620–21 (7th Cir. 2005).

sentencing courts to consider when assessing a particular defendant's involvement in the criminal activity:

> 1) the exercise of decision-making authority; 2) the nature of participation in the commission of the offense; 3) the recruitment of accomplices; 4) the claimed right to a larger share of the fruits of the crime; 5) the degree of participation in planning or organizing the offense; 6) the nature and scope of the illegal activity; and 7) the degree of control and authority exercised over others.

*Mustread*, 42 F.3d at 1104 (citing Sentencing Guidelines Manual § 3B1.1 application n. 4). Although the Sentencing Guidelines instruct that these factors are to be used to distinguish "a leadership and organizational role from one of mere management or supervision," Sentencing Guidelines Manual § 3B1.1 application n. 4 (U.S. Sentencing Comm'n 2018), sentencing courts have also used them to determine whether the defendant played an aggravating role, *see United States v. Bennett*, 708 F.3d 879, 891 (7th Cir. 2013) (citing cases from other circuits using the application note four factors to determine whether the defendant had any sort of leadership position).

Although each factor may (and should) be considered, the factors are not dispositive and are not to be weighted equally. *Mustread*, 42 F.3d at 1104. Ultimately, the sentencing court's "primary goal in applying §3B1.1 should be to make a 'commonsense judgment about the defendant's relative culpability given [the defendant's] status in the criminal hierarchy." *United States v. House*, 883 F.3d 720, 724 (7th Cir. 2018) (quoting *United States v. Dade*, 787 F.3d 1165, 1167 (7th Cir. 2015)); *United States v. Grigsby*, 692 F.3d 778, 790 (7th Cir. 2012) ("Thus, we held in *Figueroa* that a manger or supervisor should be straightforwardly understood as simply someone who helps manage or supervise a criminal scheme." (citing *United States v. Figueroa*, 682 F.3d 694, 697–98 (7th Cir. 2012))). Indeed, the Seventh Circuit has instructed that "slavish adherence to [the factors] is unnecessary," *Bennett*, 708 F.3d at 891 (quoting *Mustread*,

7

42 F.3d at 1104 n.3.), and that the key inquiry of the sentencing court's analysis should be "whether the defendant exercised some control over at least one other participant," *Mustread*, 42 F.3d at 1104; *see also Figueroa*, 682 F.3d at 697 ("If a judge, a probation officer, a lawyer, even a defendant, doesn't know what a 'manager' or 'supervisor' is, Application Note 4 isn't going to help him."). For the purposes of § 3B1.1, "a defendant exercises control and authority over another when [the defendant] 'tells people what to do and determines whether they've done it.'" *United States v. Weaver*, 716 F.3d 439, 443 (7th Cir. 2013) (quoting *Figueroa*, 682 F.3d at 697). The Seventh Circuit has also instructed that "[i]t is sufficient that the defendant orchestrated or coordinated the activities of others." *United States v. Gracia*, 272 F.3d 866, 877 (7th Cir. 2001) (citing *United States v. Fones*, 51 F.3d 663, 666 (7th Cir. 1995)). However, the application of § 3B1.1 "requires ongoing supervision, not a one-off request from one equal to another during the course of the criminal activity." *Weaver*, 716 F.3d at 444 (citing *Figueroa*, 682 F.3d at 697–98).

In this case, the DTO had a clear hierarchal scheme, with Co-Defendant Lamont Coleman at the top and the runners, Co-Defendants Leroy Coleman, Tony Petty, and Augustine Pike at the bottom. PSR ¶¶ 8–9. It is also clear that the Defendant's role was inferior to Co-Defendant Lamont Coleman—that is, she was not his equal as the head of the DTO—but her role was superior to that of the runners. The facts and details contained in the PSR indicate that the Defendant would answer calls from the DTO's customers, inform the customers of the price of heroin, organize heroin transactions, and give heroin to and dispatch the DTO runners to deliver drugs and collect cash. PSR ¶¶ 24–26. Indeed, the undisputed facts show that the Defendant maintained some level of control over the DTO's runners and exerted some level of management and supervision over the DTO's operations.

Without slavishly adhering to the note four factors, the Court observes that many of the factors weigh in favor of applying the adjustment. Although it is unlikely that Co-Defendant Lamont Coleman viewed the Defendant as his equal, she was his right hand in the organization. This is evident because she was responsible for many of the same tasks as Co-Defendant Lamont Coleman, namely communicating with customers and dispatching runners. The fact that the Defendant was tasked with answering the phone to speak with customers indicates that the Defendant was at least somewhat involved in planning and organizing the offense. Additionally, the fact that the Defendant would dispatch a runner after taking heroin orders suggests both that she had some level of control over her co-conspirators and that the DTO's runners had less autonomy within the organization than the Defendant.

The Defendant's position is similar to that of a shift manager at any retail outlet or restaurant. At such an establishment, the shift manager does not have complete autonomy, but is entrusted with running the operation in the absence of the primary boss or leader. With this responsibility comes the grant of some level of authority, namely the authority to direct the actions of any subordinate employees. Being in such a position necessarily requires the shift manager to supervise and manage operations to ensure the goals of the establishment are achieved.

Based on the assessment of the note four factors, and in light of the analogy detailed above, the Court concludes that the Defendant acted as a manager or supervisor of the DTO, as she was at least partially responsible for coordinating the organization's operations, as evidenced by her interactions with the DTO's customers, and she had some level of control over her co-conspirators, as evidenced by her deployment of runners to complete heroin transactions. Additionally, the Court concludes, again based on its assessment of the note four factors, that the

Defendant did not act as a leader or organizer of the DTO. As the Defendant correctly points out in her objection, a number of the note four factors clearly weigh in her favor. *See* Addendum to the PSR 1. For example, the Defendant did not recruit anyone to join the DTO, and nothing in the PSR suggests that the Defendant received a larger share of the fruits of the crime. *Id.* Perhaps most importantly, her role in the DTO, although important, was certainly subordinate and inferior to that of Co-Defendant Lamont Coleman. *Id.* ¶¶ 8–10. Although the Defendant's subordinate role does not spare her from a § 3B1.1 adjustment, *see United States v. McClinton*, 135 F.3d 1178, 1191 (7th Cir. 1998); *see also United States v. Tillman*, 535 F. App'x 844, 852 (11th Cir. 2013) (citing *United States v. Jones*, 933 F.2d 1541, 1547 (11th Cir. 1991)), it does suggest that an adjustment under § 3B1.1(b) is more appropriate.

It is important to note that the Court's decision takes into account the Seventh Circuit case law holding that "[s]upplying drugs and negotiating the terms of their sale do not by themselves justify a Section 3B1.1 increase, for these things do not indicate that the person who does them has a greater degree of responsibility for putting together the drug operation or a particular deal than anyone else involved, including the customer." *Weaver*, 716 F.3d at 444 (quoting *United States v. Vargas*, 16 F.3d 155, 160 (7th Cir. 1994)). The instant case can be distinguished from cases like *Weaver* because the Defendant did not front her co-conspirators heroin for resale in transactions they negotiated with individuals they identified. Rather, she provided the runners heroin from the DTO's inventory and directed them to deliver it to complete a transaction she already organized. This illustrates a level of control over others that indicates that the Defendant had a greater level of responsibility, and thus culpability, for the criminal activity. *See, e.g.*, *United States v. Sainz-Preciado*, 566 F.3d 708, 714 (7th Cir. 2009) ("We have recognized that a drug dealer's delegation of delivery or payment tasks may warrant

the imposition of a § 3B1.1 enhancement." (citing as examples *United States v. Fox*, 548 F.3d 523, 529–30 (7th Cir. 2008); *United States v. Martinez*, 520 F.3d 749, 752 (7th Cir. 2008); *United States v. Johnson*, 489 F.3d 794, 796, 798–99 (7th Cir. 2007))).

## CONCLUSION

For the reasons stated above, the Court OVERRULES the Defendant's objection, imposes an upward enhancement of three levels under § 3B1.1(b) instead of the two-level enhancement under § 3B1.1(c) recommended in the PSR, and sets the Defendant's offense level at 16. The application of § 3B1.1(b) instead of § 3B1.1(c) may seem harsh; however, this is the result mandated by the Sentencing Guidelines. The Sentencing Guidelines are intentionally rigid to ensure that the sentencing process is both consistent and efficient. The rigidity of the Sentencing Guidelines is offset by the discretionary authority held by the sentencing courts, such as the authority to impose a sentence on the lower end of the sentencing range or to depart from the sentencing range altogether.

SO ORDERED on February 20, 2020.

s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT